(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SAFFORD UNIFIED SCHOOL DISTRICT #1 ET AL. *v.* REDDING

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–479. Argued April 21, 2009—Decided June 25, 2009

After escorting 13-year-old Savana Redding from her middle school classroom to his office, Assistant Principal Wilson showed her a day planner containing knives and other contraband. She admitted owning the planner, but said that she had lent it to her friend Marissa and that the contraband was not hers. He then produced four prescription-strength, and one over-the-counter, pain relief pills, all of which are banned under school rules without advance permission. She denied knowledge of them, but Wilson said that he had a report that she was giving pills to fellow students. She denied it and agreed to let him search her belongings. He and Helen Romero, an administrative assistant, searched Savana's backpack, finding nothing. Wilson then had Romero take Savana to the school nurse's office to search her clothes for pills. After Romero and the nurse, Peggy Schwallier, had Savana remove her outer clothing, they told her to pull her bra out and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree. No pills were found. Savana's mother filed suit against petitioner school district (Safford), Wilson, Romero, and Schwallier, alleging that the strip search violated Savana's Fourth Amendment rights. Claiming qualified immunity, the individuals (hereinafter petitioners) moved for summary judgment. The District Court granted the motion, finding that there was no Fourth Amendment violation, and the en banc Ninth Circuit reversed. Following the protocol for evaluating qualified immunity claims, see *Saucier* v. *Katz*, 533 U. S. 194, 200, the court held that the strip search was unjustified under the Fourth Amendment test for searches of children by school officials set out in *New Jersey* v. *T. L. O.*, 469 U. S. 325. It then applied the test

for qualified immunity. Finding that Savana's right was clearly established at the time of the search, it reversed the summary judgment as to Wilson, but affirmed as to Schwallier and Romero because they were not independent decisionmakers.

*Held:*

1. The search of Savana's underwear violated the Fourth Amendment. Pp. 3–11.

(a) For school searches, "the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." *T. L. O.*, 469 U. S., at 341. Under the resulting reasonable suspicion standard, a school search "will be permissible . . . when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*, at 342. The required knowledge component of reasonable suspicion for a school administrator's evidence search is that it raise a moderate chance of finding evidence of wrongdoing. Pp. 3–5.

(b) Wilson had sufficient suspicion to justify searching Savana's backpack and outer clothing. A week earlier, a student, Jordan, had told the principal and Wilson that students were bringing drugs and weapons to school and that he had gotten sick from some pills. On the day of the search, Jordan gave Wilson a pill that he said came from Marissa. Learning that the pill was prescription strength, Wilson called Marissa out of class and was handed the day planner. Once in his office, Wilson, with Romero present, had Marissa turn out her pockets and open her wallet, producing, *inter alia*, an over-the-counter pill that Marissa claimed was Savana's. She also denied knowing about the day planner's contents. Wilson did not ask her when she received the pills from Savana or where Savana might be hiding them. After a search of Marissa's underwear by Romero and Schwallier revealed no additional pills, Wilson called Savana into his office. He showed her the day planner and confirmed her relationship with Marissa. He knew that the girls had been identified as part of an unusually rowdy group at a school dance, during which alcohol and cigarettes were found in the girls' bathroom. He had other reasons to connect them with this contraband, for Jordan had told the principal that before the dance, he had attended a party at Savana's house where alcohol was served. Thus, Marissa's statement that the pills came from Savana was sufficiently plausible to warrant suspicion that Savana was involved in pill distribution. A student who is reasonably suspected of giving out contraband pills is reasonably suspected of carrying them on her person and in her backpack. Looking into Savana's bag, in her presence and in the relative privacy of Wilson's office, was not excessively intrusive, any more

than Romero's subsequent search of her outer clothing. Pp. 5–8.

(c) Because the suspected facts pointing to Savana did not indicate that the drugs presented a danger to students or were concealed in her underwear, Wilson did not have sufficient suspicion to warrant extending the search to the point of making Savana pull out her underwear. Romero and Schwallier said that they did not see anything when Savana pulled out her underwear, but a strip search and its Fourth Amendment consequences are not defined by who was looking and how much was seen. Savana's actions in their presence necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings. Savana's subjective expectation of privacy is inherent in her account of it as embarrassing, frightening, and humiliating. The reasonableness of her expectation is indicated by the common reaction of other young people similarly searched, whose adolescent vulnerability intensifies the exposure's patent intrusiveness. Its indignity does not outlaw the search, but it does implicate the rule that "the search [be] 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *T. L. O., supra,* at 341. Here, the content of the suspicion failed to match the degree of intrusion. Because Wilson knew that the pills were common pain relievers, he must have known of their nature and limited threat and had no reason to suspect that large amounts were being passed around or that individual students had great quantities. Nor could he have suspected that Savana was hiding common painkillers in her underwear. When suspected facts must support the categorically extreme intrusiveness of a search down to an adolescent's body, petitioners' general belief that students hide contraband in their clothing falls short; a reasonable search that extensive calls for suspicion that it will succeed. Nondangerous school contraband does not conjure up the specter of stashes in intimate places, and there is no evidence of such behavior at the school; neither Jordan nor Marissa suggested that Savana was doing that, and the search of Marissa yielded nothing. Wilson also never determined when Marissa had received the pills from Savana; had it been a few days before, that would weigh heavily against any reasonable conclusion that Savana presently had the pills on her person, much less in her underwear. Pp. 8–11.

2. Although the strip search violated Savana's Fourth Amendment rights, petitioners Wilson, Romero, and Schwallier are protected from liability by qualified immunity because "clearly established law [did] not show that the search violated the Fourth Amendment," *Pearson*

Syllabus

v. *Callahan*, 555 U. S. ___, ___.  The intrusiveness of the strip search here cannot, under *T. L. O.,* be seen as justifiably related to the circumstances, but lower court cases viewing school strip searches differently are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt about the clarity with which the right was previously stated.  Pp. 11–13.

    3. The issue of petitioner Safford's liability under *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 694, should be addressed on remand.  P. 13.

531 F. 3d 1071, affirmed in part, reversed in part, and remanded.

    SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, and ALITO, JJ., joined, and in which STEVENS and GINSBURG, JJ., joined as to Parts I–III.  STEVENS, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, J., joined.  GINSBURG, J., filed an opinion concurring in part and dissenting in part.  THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–479

SAFFORD UNIFIED SCHOOL DISTRICT #1, ET AL., PETITIONERS *v.* APRIL REDDING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2009]

JUSTICE SOUTER delivered the opinion of the Court.

The issue here is whether a 13-year-old student's Fourth Amendment right was violated when she was subjected to a search of her bra and underpants by school officials acting on reasonable suspicion that she had brought forbidden prescription and over-the-counter drugs to school. Because there were no reasons to suspect the drugs presented a danger or were concealed in her underwear, we hold that the search did violate the Constitution, but because there is reason to question the clarity with which the right was established, the official who ordered the unconstitutional search is entitled to qualified immunity from liability.

I

The events immediately prior to the search in question began in 13-year-old Savana Redding's math class at Safford Middle School one October day in 2003. The assistant principal of the school, Kerry Wilson, came into the room and asked Savana to go to his office. There, he showed her a day planner, unzipped and open flat on his desk, in which there were several knives, lighters, a per-

manent marker, and a cigarette. Wilson asked Savana whether the planner was hers; she said it was, but that a few days before she had lent it to her friend, Marissa Glines. Savana stated that none of the items in the planner belonged to her.

Wilson then showed Savana four white prescription-strength ibuprofen 400-mg pills, and one over-the-counter blue naproxen 200-mg pill, all used for pain and inflammation but banned under school rules without advance permission. He asked Savana if she knew anything about the pills. Savana answered that she did not. Wilson then told Savana that he had received a report that she was giving these pills to fellow students; Savana denied it and agreed to let Wilson search her belongings. Helen Romero, an administrative assistant, came into the office, and together with Wilson they searched Savana's backpack, finding nothing.

At that point, Wilson instructed Romero to take Savana to the school nurse's office to search her clothes for pills. Romero and the nurse, Peggy Schwallier, asked Savana to remove her jacket, socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets), which she was then asked to remove. Finally, Savana was told to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree. No pills were found.

Savana's mother filed suit against Safford Unified School District #1, Wilson, Romero, and Schwallier for conducting a strip search in violation of Savana's Fourth Amendment rights. The individuals (hereinafter petitioners) moved for summary judgment, raising a defense of qualified immunity. The District Court for the District of Arizona granted the motion on the ground that there was no Fourth Amendment violation, and a panel of the Ninth Circuit affirmed. 504 F. 3d 828 (2007).

A closely divided Circuit sitting en banc, however, re-

versed. Following the two-step protocol for evaluating claims of qualified immunity, see *Saucier* v. *Katz*, 533 U. S. 194, 200 (2001), the Ninth Circuit held that the strip search was unjustified under the Fourth Amendment test for searches of children by school officials set out in *New Jersey* v. *T. L. O.*, 469 U. S. 325 (1985). 531 F. 3d 1071, 1081–1087 (2008). The Circuit then applied the test for qualified immunity, and found that Savana's right was clearly established at the time of the search: "'[t]hese notions of personal privacy are "clearly established" in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches.'" *Id.*, at 1088–1089 (quoting *Brannum* v. *Overton Cty. School Bd.*, 516 F. 3d 489, 499 (CA6 2008)). The upshot was reversal of summary judgment as to Wilson, while affirming the judgments in favor of Schwallier, the school nurse, and Romero, the administrative assistant, since they had not acted as independent decisionmakers. 531 F. 3d, at 1089.

We granted certiorari, 555 U. S. ___ (2009), and now affirm in part, reverse in part, and remand.

## II

The Fourth Amendment "right of the people to be secure in their persons . . . against unreasonable searches and seizures" generally requires a law enforcement officer to have probable cause for conducting a search. "Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed," *Brinegar* v. *United States*, 338 U. S. 160, 175–176 (1949) (quoting *Carroll* v. *United States*, 267 U. S. 132, 162 (1925)), and that evidence bearing on that offense will be found in the

place to be searched.

In *T. L. O.*, we recognized that the school setting "requires some modification of the level of suspicion of illicit activity needed to justify a search," 469 U. S., at 340, and held that for searches by school officials "a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause," *id.*, at 341. We have thus applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student, *id.*, at 342, 345, and have held that a school search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction," *id.*, at 342.

A number of our cases on probable cause have an implicit bearing on the reliable knowledge element of reasonable suspicion, as we have attempted to flesh out the knowledge component by looking to the degree to which known facts imply prohibited conduct, see, *e.g.*, *Adams* v. *Williams*, 407 U. S. 143, 148 (1972); *id.*, at 160, n. 9 (Marshall, J., dissenting), the specificity of the information received, see, *e.g.*, *Spinelli* v. *United States*, 393 U. S. 410, 416–417 (1969), and the reliability of its source, see, *e.g.*, *Aguilar* v. *Texas*, 378 U. S. 108, 114 (1964). At the end of the day, however, we have realized that these factors cannot rigidly control, *Illinois* v. *Gates*, 462 U. S. 213, 230 (1983), and we have come back to saying that the standards are "fluid concepts that take their substantive content from the particular contexts" in which they are being assessed. *Ornelas* v. *United States*, 517 U. S. 690, 696 (1996).

Perhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer's evidence search is that it raise a "fair

probability," *Gates*, 462 U. S., at 238, or a "substantial chance," *id.*, at 244, n. 13, of discovering evidence of criminal activity. The lesser standard for school searches could as readily be described as a moderate chance of finding evidence of wrongdoing.

## III
## A

In this case, the school's policies strictly prohibit the nonmedical use, possession, or sale of any drug on school grounds, including "'[a]ny prescription or over-the-counter drug, except those for which permission to use in school has been granted pursuant to Board policy.'" App. to Pet. for Cert. 128a.[1]  A week before Savana was searched, another student, Jordan Romero (no relation of the school's administrative assistant), told the principal and Assistant Principal Wilson that "certain students were bringing drugs and weapons on campus," and that he had been sick after taking some pills that "he got from a classmate." App. 8a.  On the morning of October 8, the same boy handed Wilson a white pill that he said Marissa Glines had given him.  He told Wilson that students were

_____

[1] When the object of a school search is the enforcement of a school rule, a valid search assumes, of course, the rule's legitimacy.  But the legitimacy of the rule usually goes without saying as it does here.  The Court said plainly in *New Jersey* v. *T. L. O.*, 469 U. S. 325, 342, n. 9 (1985), that standards of conduct for schools are for school administrators to determine without second-guessing by courts lacking the experience to appreciate what may be needed.  Except in patently arbitrary instances, Fourth Amendment analysis takes the rule as a given, as it obviously should do in this case.  There is no need here either to explain the imperative of keeping drugs out of schools, or to explain the reasons for the school's rule banning all drugs, no matter how benign, without advance permission.  Teachers are not pharmacologists trained to identify pills and powders, and an effective drug ban has to be enforceable fast.  The plenary ban makes sense, and there is no basis to claim that the search was unreasonable owing to some defect or shortcoming of the rule it was aimed at enforcing.

planning to take the pills at lunch.

Wilson learned from Peggy Schwallier, the school nurse, that the pill was Ibuprofen 400 mg, available only by prescription.  Wilson then called Marissa out of class. Outside the classroom, Marissa's teacher handed Wilson the day planner, found within Marissa's reach, containing various contraband items.  Wilson escorted Marissa back to his office.

In the presence of Helen Romero, Wilson requested Marissa to turn out her pockets and open her wallet. Marissa produced a blue pill, several white ones, and a razor blade.  Wilson asked where the blue pill came from, and Marissa answered, "'I guess it slipped in when *she* gave me the IBU 400s.'"  *Id.*, at 13a.  When Wilson asked whom she meant, Marissa replied, "'Savana Redding.'" *Ibid.*  Wilson then enquired about the day planner and its contents; Marissa denied knowing anything about them. Wilson did not ask Marissa any followup questions to determine whether there was any likelihood that Savana presently had pills: neither asking when Marissa received the pills from Savana nor where Savana might be hiding them.

Schwallier did not immediately recognize the blue pill, but information provided through a poison control hotline[2] indicated that the pill was a 200-mg dose of an anti-inflammatory drug, generically called naproxen, available over the counter.  At Wilson's direction, Marissa was then subjected to a search of her bra and underpants by Romero and Schwallier, as Savana was later on.  The search revealed no additional pills.

_____

[2] Poison control centers across the country maintain 24-hour help hotlines to provide "immediate access to poison exposure management instructions and information on potential poisons."  American Association of Poison Control Centers, online at http://www.aapcc.org/dnn/ About/tabid/74/Default.aspx (all Internet materials as visited June 19, 2009, and available in Clerk of Court's case file).

It was at this juncture that Wilson called Savana into his office and showed her the day planner. Their conversation established that Savana and Marissa were on friendly terms: while she denied knowledge of the contraband, Savana admitted that the day planner was hers and that she had lent it to Marissa. Wilson had other reports of their friendship from staff members, who had identified Savana and Marissa as part of an unusually rowdy group at the school's opening dance in August, during which alcohol and cigarettes were found in the girls' bathroom. Wilson had reason to connect the girls with this contraband, for Wilson knew that Jordan Romero had told the principal that before the dance, he had been at a party at Savana's house where alcohol was served. Marissa's statement that the pills came from Savana was thus sufficiently plausible to warrant suspicion that Savana was involved in pill distribution.

This suspicion of Wilson's was enough to justify a search of Savana's backpack and outer clothing.[3] If a student is reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today. If Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making. And the look into Savana's bag, in her presence and in the relative privacy of Wilson's office, was not excessively intrusive, any more than Romero's subsequent search of her outer clothing.

———————

[3] There is no question here that justification for the school officials' search was required in accordance with the *T. L. O.* standard of reasonable suspicion, for it is common ground that Savana had a reasonable expectation of privacy covering the personal things she chose to carry in her backpack, cf. 469 U. S., at 339, and that Wilson's decision to look through it was a "search" within the meaning of the Fourth Amendment.

B

Here it is that the parties part company, with Savana's claim that extending the search at Wilson's behest to the point of making her pull out her underwear was constitutionally unreasonable. The exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it. Romero and Schwallier directed Savana to remove her clothes down to her underwear, and then "pull out" her bra and the elastic band on her underpants. *Id.*, at 23a. Although Romero and Schwallier stated that they did not see anything when Savana followed their instructions, App. to Pet. for Cert. 135a, we would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen. The very fact of Savana's pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.

Savana's subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, frightening, and humiliating. The reasonableness of her expectation (required by the Fourth Amendment standard) is indicated by the consistent experiences of other young people similarly searched, whose adolescent vulnerability intensifies the patent intrusiveness of the exposure. See Brief for National Association of Social Workers et al. as *Amici Curiae* 6–14; Hyman & Perone, The Other Side of School Violence: Educator Policies and Practices that may Contribute to Student Misbehavior, 36 J. School Psychology 7, 13 (1998) (strip search can "result in serious emotional damage"). The common reaction of these adoles-

cents simply registers the obviously different meaning of a search exposing the body from the experience of naked-ness or near undress in other school circumstances. Changing for gym is getting ready for play; exposing for a search is responding to an accusation reserved for sus-pected wrongdoers and fairly understood as so degrading that a number of communities have decided that strip searches in schools are never reasonable and have banned them no matter what the facts may be, see, *e.g.*, New York City Dept. of Education, Reg. No. A–432, p. 2 (2005), online at http://docs.nycenet.edu/docushare/dsweb/Get/Document-21/A-432.pdf ("Under no circumstances shall a strip-search of a student be conducted").

The indignity of the search does not, of course, outlaw it, but it does implicate the rule of reasonableness as stated in *T. L. O.*, that "the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place." 469 U. S., at 341 (internal quotation marks omitted). The scope will be permissible, that is, when it is "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*, at 342.

Here, the content of the suspicion failed to match the degree of intrusion. Wilson knew beforehand that the pills were prescription-strength ibuprofen and over-the-counter naproxen, common pain relievers equivalent to two Advil, or one Aleve.[4] He must have been aware of the nature and limited threat of the specific drugs he was searching for, and while just about anything can be taken in quantities that will do real harm, Wilson had no reason to suspect

_____

[4] An Advil tablet, caplet, or gel caplet, contains 200 mg of ibuprofen. See Physicians' Desk Reference for Nonprescription Drugs, Dietary Supplements, and Herbs 674 (28th ed. 2006). An Aleve caplet contains 200 mg naproxen and 20 mg sodium. See *id.*, at 675.

that large amounts of the drugs were being passed around, or that individual students were receiving great numbers of pills.

Nor could Wilson have suspected that Savana was hiding common painkillers in her underwear. Petitioners suggest, as a truth universally acknowledged, that "students . . . hid[e] contraband in or under their clothing," Reply Brief for Petitioners 8, and cite a smattering of cases of students with contraband in their underwear, *id.*, at 8–9. But when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off. But nondangerous school contraband does not raise the specter of stashes in intimate places, and there is no evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear; neither Jordan nor Marissa suggested to Wilson that Savana was doing that, and the preceding search of Marissa that Wilson ordered yielded nothing. Wilson never even determined when Marissa had received the pills from Savana; if it had been a few days before, that would weigh heavily against any reasonable conclusion that Savana presently had the pills on her person, much less in her underwear.

In sum, what was missing from the suspected facts that pointed to Savana was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that Savana was carrying pills in her underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.

In so holding, we mean to cast no ill reflection on the assistant principal, for the record raises no doubt that his motive throughout was to eliminate drugs from his school and protect students from what Jordan Romero had gone

through. Parents are known to overreact to protect their children from danger, and a school official with responsibility for safety may tend to do the same. The difference is that the Fourth Amendment places limits on the official, even with the high degree of deference that courts must pay to the educator's professional judgment.

We do mean, though, to make it clear that the *T. L. O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.

## IV

A school official searching a student is "entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson* v. *Callahan*, 555 U. S. __, __ (2009) (slip op., at 18). To be established clearly, however, there is no need that "the very action in question [have] previously been held unlawful." *Wilson* v. *Layne*, 526 U. S. 603, 615 (1999). The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that "[t]he easiest cases don't even arise." *K. H.* v. *Morgan*, 914 F. 2d 846, 851 (CA7 1990). But even as to action less than an outrage, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002).

*T. L. O.* directed school officials to limit the intrusiveness of a search, "in light of the age and sex of the student and the nature of the infraction," 469 U. S., at 342, and as

we have just said at some length, the intrusiveness of the strip search here cannot be seen as justifiably related to the circumstances. But we realize that the lower courts have reached divergent conclusions regarding how the *T. L. O.* standard applies to such searches.

A number of judges have read *T. L. O.* as the en banc minority of the Ninth Circuit did here. The Sixth Circuit upheld a strip search of a high school student for a drug, without any suspicion that drugs were hidden next to her body. *Williams* v. *Ellington*, 936 F. 2d 881, 882–883, 887 (1991). And other courts considering qualified immunity for strip searches have read *T. L. O.* as "a series of abstractions, on the one hand, and a declaration of seeming deference to the judgments of school officials, on the other," *Jenkins* v. *Talladega City Bd. of Ed.*, 115 F. 3d 821, 828 (CA11 1997) (en banc), which made it impossible "to establish clearly the contours of a Fourth Amendment right . . . [in] the wide variety of possible school settings different from those involved in *T. L. O.*" itself. *Ibid.* See also *Thomas* v. *Roberts*, 323 F. 3d 950 (CA11 2003) (granting qualified immunity to a teacher and police officer who conducted a group strip search of a fifth grade class when looking for a missing $26).

We think these differences of opinion from our own are substantial enough to require immunity for the school officials in this case. We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt that we were sufficiently clear in the prior statement of law. We conclude that qualified

immunity is warranted.

## V

The strip search of Savana Redding was unreasonable and a violation of the Fourth Amendment, but petitioners Wilson, Romero, and Schwallier are nevertheless protected from liability through qualified immunity. Our conclusions here do not resolve, however, the question of the liability of petitioner Safford Unified School District #1 under *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 694 (1978), a claim the Ninth Circuit did not address. The judgment of the Ninth Circuit is therefore affirmed in part and reversed in part, and this case is remanded for consideration of the *Monell* claim.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

<hr>

No. 08–479

<hr>

## SAFFORD UNIFIED SCHOOL DISTRICT #1, ET AL., PETITIONERS *v.* APRIL REDDING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2009]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

In *New Jersey* v. *T. L. O.*, 469 U. S. 325 (1985), the Court established a two-step inquiry for determining the reasonableness of a school official's decision to search a student.  First, the Court explained, the search must be "'justified at its inception'" by the presence of "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.*, at 342.  Second, the search must be "permissible in its scope," which is achieved "when the measures adopted are reasonably related to the objectives of the search and *not excessively intrusive in light of the age and sex of the student and the nature of the infraction.*" *Ibid.* (emphasis added).

Nothing the Court decides today alters this basic framework.  It simply applies *T. L. O.* to declare unconstitutional a strip search of a 13-year-old honors student that was based on a groundless suspicion that she might be hiding medicine in her underwear.  This is, in essence, a case in which clearly established law meets clearly outrageous conduct.  I have long believed that "'[i]t does not require a constitutional scholar to conclude that a nude search of a 13-year-old child is an invasion of constitutional rights of some magnitude.'"  *Id.*, at 382, n. 25

(STEVENS, J., concurring in part and dissenting in part) (quoting *Doe* v. *Renfrow*, 631 F. 2d 91, 92–93 (CA7 1980)). The strip search of Savana Redding in this case was both more intrusive and less justified than the search of the student's purse in *T. L. O.* Therefore, while I join Parts I–III of the Court's opinion, I disagree with its decision to extend qualified immunity to the school official who authorized this unconstitutional search.

The Court reaches a contrary conclusion about qualified immunity based on the fact that various Courts of Appeals have adopted seemingly divergent views about *T. L. O.*'s application to strip searches. *Ante*, at 12. But the clarity of a well-established right should not depend on whether jurists have misread our precedents. And while our cases have previously noted the "divergence of views" among courts in deciding whether to extend qualified immunity, *e.g.*, *Pearson* v. *Callahan*, (2009) 555 U. S., ___, ___ (slip op., at 20) (noting the unsettled constitutionality of the so-called "consent-once-removed" doctrine); *Wilson* v. *Layne*, 526 U. S. 603, 618 (1999) (considering conflicting views on the constitutionality of law enforcement's practice of allowing the media to enter a private home to observe and film attempted arrests), we have relied on that consideration only to spare officials from having "'to predict the *future course* of constitutional law,'" *Id.,* at 617 (quoting *Procunier* v. *Navarette*, 434 U. S. 555, 562 (1978); emphasis added). In this case, by contrast, we chart no new constitutional path. We merely decide whether the decision to strip search Savana Redding, on these facts, was prohibited under *T. L. O.* Our conclusion leaves the boundaries of the law undisturbed.*

—————

\* In fact, in *T. L. O.* we cited with approval a Ninth Circuit case, *Bilbrey* v. *Brown*, 738  F. 2d 1462 (1984), which held that a strip search performed under similar circumstances violated the Constitution. *New Jersey* v. *T. L. O.*, 469 U. S. 325, 332, n. 2 (1985); *id.*, at 341, and n. 6 (adopting *Bilbrey*'s reasonable suspicion standard).

The Court of Appeals properly rejected the school official's qualified immunity defense, and I would affirm that court's judgment in its entirety.

# SUPREME COURT OF THE UNITED STATES

———

No. 08–479

———

## SAFFORD UNIFIED SCHOOL DISTRICT #1, ET AL., PETITIONERS *v.* APRIL REDDING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2009]

JUSTICE GINSBURG, concurring in part and dissenting in part.

I agree with the Court that Assistant Principal Wilson's subjection of 13-year-old Savana Redding to a humiliating stripdown search violated the Fourth Amendment. But I also agree with JUSTICE STEVENS, *ante*, at 1–2, that our opinion in *New Jersey* v. *T. L. O.*, 469 U. S. 325 (1985), "clearly established" the law governing this case.

Fellow student Marissa Glines, caught with pills in her pocket, accused Redding of supplying them. App. 13a. Asked where the blue pill among several white pills in Glines's pocket came from, Glines answered: "I guess it slipped in when *she* gave me the IBU 400s." *Ibid.* Asked next "who is *she*?", Glines responded: "Savana Redding." *Ibid.* As the Court observes, *ante*, at 6, 10, no followup questions were asked. Wilson did not test Glines's accusation for veracity by asking Glines when did Redding give her the pills, where, for what purpose. Any reasonable search for the pills would have ended when inspection of Redding's backpack and jacket pockets yielded nothing. Wilson had no cause to suspect, based on prior experience at the school or clues in this case, that Redding had hidden pills—containing the equivalent of two Advils or one Aleve—in her underwear or body. To make matters worse, Wilson did not release Redding, to return to class

or to go home, after the search. Instead, he made her sit on a chair outside his office for over two hours. At no point did he attempt to call her parent. Abuse of authority of that order should not be shielded by official immunity.

In contrast to *T. L. O.*, where a teacher discovered a student smoking in the lavatory, and where the search was confined to the student's purse, the search of Redding involved her body and rested on the bare accusation of another student whose reliability the Assistant Principal had no reason to trust. The Court's opinion in *T. L. O.* plainly stated the controlling Fourth Amendment law: A search ordered by a school official, even if "justified at its inception," crosses the constitutional boundary if it becomes "excessively intrusive in light of the age and sex of the student and the nature of the infraction." 469 U. S., at 342 (internal quotation marks omitted).

Here, "the nature of the [supposed] infraction," the slim basis for suspecting Savana Redding, and her "age and sex," *ibid.*, establish beyond doubt that Assistant Principal Wilson's order cannot be reconciled with this Court's opinion in *T. L. O.* Wilson's treatment of Redding was abusive and it was not reasonable for him to believe that the law permitted it. I join JUSTICE STEVENS in dissenting from the Court's acceptance of Wilson's qualified immunity plea, and would affirm the Court of Appeals' judgment in all respects.

# SUPREME COURT OF THE UNITED STATES

No. 08–479

SAFFORD UNIFIED SCHOOL DISTRICT #1, ET AL.,
PETITIONERS *v.* APRIL REDDING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2009]

JUSTICE THOMAS, concurring in the judgment in part
and dissenting in part.

I agree with the Court that the judgment against the
school officials with respect to qualified immunity should
be reversed. See *ante*, at 11–13. Unlike the majority,
however, I would hold that the search of Savana Redding
did not violate the Fourth Amendment. The majority
imposes a vague and amorphous standard on school ad-
ministrators. It also grants judges sweeping authority to
second-guess the measures that these officials take to
maintain discipline in their schools and ensure the health
and safety of the students in their charge. This deep
intrusion into the administration of public schools exem-
plifies why the Court should return to the common-law
doctrine of *in loco parentis* under which "the judiciary was
reluctant to interfere in the routine business of school
administration, allowing schools and teachers to set and
enforce rules and to maintain order." *Morse* v. *Frederick*,
551 U. S. 393, 414 (2007) (THOMAS, J., concurring). But
even under the prevailing Fourth Amendment test estab-
lished by *New Jersey* v. *T. L. O.*, 469 U. S. 325 (1985), all
petitioners, including the school district, are entitled to
judgment as a matter of law in their favor.

## I

"Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." *Id.*, at 337. Thus, although public school students retain Fourth Amendment rights under this Court's precedent, see *id.*, at 333–337, those rights "are different . . . than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 656 (1995); see also *T. L. O.*, 469 U. S., at 339 (identifying "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds"). For nearly 25 years this Court has understood that "[m]aintaining order in the classroom has never been easy, but in more recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." *Ibid.* In schools, "[e]vents calling for discipline are frequent occurrences and sometimes require immediate, effective action." *Goss* v. *Lopez*, 419 U. S. 565, 580 (1975); see also *T. L. O.,* 469 U. S., at 340 (explaining that schools have a "legitimate need to maintain an environment in which learning can take place").

For this reason, school officials retain broad authority to protect students and preserve "order and a proper educational environment" under the Fourth Amendment. *Id.,* at 339. This authority requires that school officials be able to engage in the "close supervision of schoolchildren, as well as . . . enforc[e] rules against conduct that would be perfectly permissible if undertaken by an adult." *Ibid.* Seeking to reconcile the Fourth Amendment with this unique public school setting, the Court in *T. L. O.* held that a school search is "reasonable" if it is "'justified at its inception'" and "'reasonably related in scope to the cir-

cumstances which justified the interference in the first place.'" *Id.*, at 341–342 (quoting *Terry* v. *Ohio*, 392 U. S. 1, 20 (1968)). The search under review easily meets this standard.

## A

A "search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T. L. O.*, *supra*, at 341–342 (footnote omitted). As the majority rightly concedes, this search was justified at its inception because there were reasonable grounds to suspect that Redding possessed medication that violated school rules. See *ante*, at 7. A finding of reasonable suspicion "does not deal with hard certainties, but with probabilities." *United States* v. *Cortez*, 449 U. S. 411, 418 (1981); see also *T. L. O.*, *supra*, at 346 ("[T]he requirement of reasonable suspicion is not a requirement of absolute certainty"). To satisfy this standard, more than a mere "hunch" of wrongdoing is required, but "considerably" less suspicion is needed than would be required to "satisf[y] a preponderance of the evidence standard." *United States* v. *Arvizu*, 534 U. S. 266, 274 (2002) (internal quotation marks omitted).

Furthermore, in evaluating whether there is a reasonable "particularized and objective" basis for conducting a search based on suspected wrongdoing, government officials must consider the "totality of the circumstances." *Id.*, at 273 (internal quotation marks omitted). School officials have a specialized understanding of the school environment, the habits of the students, and the concerns of the community, which enables them to "'formulat[e] certain common-sense conclusions about human behavior.'" *United States* v. *Sokolow*, 490 U. S. 1, 8 (1989) (quoting *Cortez*, *supra*, at 418). And like police officers, school

officials are "entitled to make an assessment of the situation in light of [this] specialized training and familiarity with the customs of the [school]." See *Arvizu*, *supra*, at 276.

Here, petitioners had reasonable grounds to suspect that Redding was in possession of prescription and non-prescription drugs in violation of the school's prohibition of the "non-medical use, possession, or sale of a drug" on school property or at school events. 531 F. 3d 1071, 1076 (CA9 2008) (en banc); see also *id.*, at 1107 (Hawkins, J., dissenting) (explaining that the school policy defined "drugs" to include "'[a]ny prescription or over-the-counter drug, except those for which permission to use in school has been granted'"). As an initial matter, school officials were aware that a few years earlier, a student had become "seriously ill" and "spent several days in intensive care" after ingesting prescription medication obtained from a classmate. App. 10a. Fourth Amendment searches do not occur in a vacuum; rather, context must inform the judicial inquiry. See *Cortez*, *supra*, at 417–418. In this instance, the suspicion of drug possession arose at a middle school that had "a history of problems with students using and distributing prohibited and illegal substances on campus." App. 7a, 10a.

The school's substance-abuse problems had not abated by the 2003–2004 school year, which is when the challenged search of Redding took place. School officials had found alcohol and cigarettes in the girls' bathroom during the first school dance of the year and noticed that a group of students including Redding and Marissa Glines smelled of alcohol. *Ibid.* Several weeks later, another student, Jordan Romero, reported that Redding had hosted a party before the dance where she served whiskey, vodka, and tequila. *Id.,* at 8a, 11a. Romero had provided this report to school officials as a result of a meeting his mother scheduled with the officials after Romero "bec[a]me vio-

lent" and "sick to his stomach" one night and admitted that "he had taken some pills that he had got[ten] from a classmate." *Id.,* at 7a–8a, 10a–11a. At that meeting, Romero admitted that "certain students were bringing drugs and weapons on campus." *Id.,* at 8a, 11a. One week later, Romero handed the assistant principal a white pill that he said he had received from Glines. *Id.,* at 11a. He reported "that a group of students [were] planning on taking the pills at lunch." *Ibid.*

School officials justifiably took quick action in light of the lunchtime deadline. The assistant principal took the pill to the school nurse who identified it as prescription-strength 400-mg Ibuprofen. *Id.,* at 12a. A subsequent search of Glines and her belongings produced a razor blade, a Naproxen 200-mg pill, and several Ibuprofen 400-mg pills. *Id.,* at 13a. When asked, Glines claimed that she had received the pills from Redding. *Ibid.* A search of Redding's planner, which Glines had borrowed, then uncovered "several knives, several lighters, a cigarette, and a permanent marker." *Id.,* at 12a, 14a, 22a. Thus, as the majority acknowledges, *ante*, at 7, the totality of relevant circumstances justified a search of Redding for pills.[1]

B

The remaining question is whether the search was reasonable in scope. Under *T. L. O.*, "a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the

_____

[1] To be sure, Redding denied knowledge of the pills and the materials in her planner. App. 14a. But her denial alone does not negate the reasonable suspicion held by school officials. See *New Jersey* v. *T. L. O.*, 469 U. S. 325, 345 (1985) (finding search reasonable even though "T. L. O. had been accused of smoking, and had denied the accusation in the strongest possible terms when she stated that she did not smoke at all").

student and the nature of the infraction."   469 U. S., at 342.   The majority concludes that the school officials' search of Redding's underwear was not "'reasonably re-lated in scope to the circumstances which justified the interference in the first place,'" see *ante*, at 8–11, notwith-standing the officials' reasonable suspicion that Redding "was involved in pill distribution," *ante,* at 7.  According to the majority, to be reasonable, this school search required a showing of "danger to the students from the power of the drugs or their quantity" or a "reason to suppose that [Red-ding] was carrying pills in her underwear."  *Ante*, at 10. Each of these additional requirements is an unjustifiable departure from bedrock Fourth Amendment law in the school setting, where this Court has heretofore read the Fourth Amendment to grant considerable leeway to school officials.  Because the school officials searched in a loca-tion where the pills could have been hidden, the search was reasonable in scope under *T. L. O.*

1

The majority finds that "subjective and reasonable societal expectations of personal privacy support . . . treat[ing]" this type of search, which it labels a "strip search," as "categorically distinct, requiring distinct ele-ments of justification on the part of school authorities for going beyond a search of clothing and belongings."  *Ante*, at 8.[2]  Thus, in the majority's view, although the school officials had reasonable suspicion to believe that Redding

---

[2] Like the dissent below, "I would reserve the term 'strip search' for a search that required its subject to fully disrobe in view of officials."  531 F. 3d 1071, 1091, n. 1 (CA9 2008) (opinion of Hawkins, J.).  The distinc-tion between a strip search and the search at issue in this case may be slight, but it is a distinction that the law has drawn.  See, *e.g., Sandin* v. *Conner*, 515 U. S. 472, 475 (1995) ("The officer subjected Conner to a strip search, complete with inspection of the rectal area"); *Bell* v. *Wolfish*, 441 U. S. 520, 558, and n. 39 (1979) (describing visual inspec-tion of body cavities as "part of a strip search").

had the pills on her person, see *ante*, at 7, they needed some greater level of particularized suspicion to conduct this "strip search." There is no support for this contortion of the Fourth Amendment.

The Court has generally held that the reasonableness of a search's scope depends only on whether it is limited to the area that is capable of concealing the object of the search. See, *e.g., Wyoming* v. *Houghton*, 526 U. S. 295, 307 (1999) (Police officers "may inspect passengers' belongings found in the car that are capable of concealing the object of the search"); *Florida* v. *Jimeno*, 500 U. S. 248, 251 (1991) ("The scope of a search is generally defined by its expressed object"); *United States* v. *Johns*, 469 U. S. 478, 487 (1985) (search reasonable because "there is no plausible argument that the object of the search could not have been concealed in the packages"); *United States* v. *Ross*, 456 U. S. 798, 820 (1982) ("A lawful search . . . generally extends to the entire area in which the object of the search may be found").[3]

In keeping with this longstanding rule, the "nature of the infraction" referenced in *T. L. O.* delineates the proper scope of a search of students in a way that is identical to that permitted for searches outside the school—*i.e.*, the search must be limited to the areas where the object of that infraction could be concealed. See *Horton* v. *California*, 496 U. S. 128, 141 (1990) ("Police with a warrant for a rifle may search only places where rifles might be" (internal quotation marks omitted)); *Ross*, *supra*, at 824 ("[P]robable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless

--------

[3] The Court has adopted a different standard for searches involving an "intrusio[n] into the human body." *Schmerber* v. *California*, 384 U. S. 757, 770 (1966). The search here does not implicate the Court's cases governing bodily intrusions, however, because it did not involve a "physical intrusion, penetrating beneath the skin," *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 616 (1989).

search of a suitcase"). A search of a student therefore is permissible in scope under *T. L. O.* so long as it is objectively reasonable to believe that the area searched could conceal the contraband. The dissenting opinion below correctly captured this Fourth Amendment standard, noting that "if a student brought a baseball bat on campus in violation of school policy, a search of that student's shirt pocket would be patently unjustified." 531 F. 3d, at 1104 (opinion of Hawkins, J.).

The analysis of whether the scope of the search here was permissible under that standard is straightforward. Indeed, the majority does not dispute that "general background possibilities" establish that students conceal "contraband in their underwear." *Ante,* at 10. It acknowledges that school officials had reasonable suspicion to look in Redding's backpack and outer clothing because if "Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making." *Ante*, at 7. The majority nevertheless concludes that proceeding any further with the search was unreasonable. See *ante*, at 8–10; see also *ante*, at 1 (GINSBURG, J., concurring in part and dissenting in part) ("Any reasonable search for the pills would have ended when inspection of Redding's backpack and jacket pockets yielded nothing"). But there is no support for this conclusion. The reasonable suspicion that Redding possessed the pills for distribution purposes did not dissipate simply because the search of her backpack turned up nothing. It was eminently reasonable to conclude that the backpack was empty because Redding was secreting the pills in a place she thought no one would look. See *Ross*, *supra*, at 820 ("Contraband goods rarely are strewn" about in plain view; "by their very nature such goods must be withheld from public view").

Redding would not have been the first person to conceal pills in her undergarments. See Hicks, Man Gets 17-Year

Drug Sentence, [Corbin, KY] Times-Tribune, Oct. 7, 2008, p. 1 (Drug courier "told officials she had the [Oxycontin] pills concealed in her crotch"); Conley, Whitehaven: Traffic Stop Yields Hydrocodone Pills, [Memphis] Commercial Appeal, Aug. 3, 2007, p. B3 ("An additional 40 hydro-codone pills were found in her pants"); Caywood, Police Vehicle Chase Leads to Drug Arrests, [Worcester] Tele-gram & Gazette, June 7, 2008, p. A7 (25-year-old "alleg-edly had a cigar tube stuffed with pills tucked into the waistband of his pants"); Hubartt, 23-Year-Old Charged With Dealing Ecstasy, The [Fort Wayne] Journal Gazette, Aug. 8, 2007, p. C2 ("[W]hile he was being put into a squad car, his pants fell down and a plastic bag containing pink and orange pills fell on the ground"); Sebastian Residents Arrested in Drug Sting, Vero Beach Press Journal, Sept. 16, 2006, p. B2 (Arrestee "told them he had more pills 'down my pants'"). Nor will she be the last after today's decision, which announces the safest place to secrete contraband in school.

2

The majority compounds its error by reading the "nature of the infraction" aspect of the *T. L. O.* test as a license to limit searches based on a judge's assessment of a particu-lar school policy. According to the majority, the scope of the search was impermissible because the school official "must have been aware of the nature and limited threat of the specific drugs he was searching for" and because he "had no reason to suspect that large amounts of the drugs were being passed around, or that individual students were receiving great numbers of pills." *Ante*, at 9–10. Thus, in order to locate a rationale for finding a Fourth Amendment violation in this case, the majority retreats from its observation that the school's firm no-drug policy "makes sense, and there is no basis to claim that the search was unreasonable owing to some defect or short-

coming of the rule it was aimed at enforcing." *Ante*, at 5, n. 1.

Even accepting the majority's assurances that it is not attacking the rule's reasonableness, it certainly is attacking the rule's importance. This approach directly conflicts with *T. L. O.* in which the Court was "unwilling to adopt a standard under which the legality of a search is dependent upon a judge's evaluation of the relative importance of school rules." 469 U. S., at 342, n. 9. Indeed, the Court in *T. L. O.* expressly rejected the proposition that the majority seemingly endorses—that "some rules regarding student conduct are by nature too 'trivial' to justify a search based upon reasonable suspicion." *Ibid.;* see also *id.,* at 343, n. 9 ("The promulgation of a rule forbidding specified conduct presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment. Absent any suggestion that the rule violates some substantive constitutional guarantee, the courts should as a general matter, defer to that judgment").

The majority's decision in this regard also departs from another basic principle of the Fourth Amendment: that law enforcement officials can enforce with the same vigor all rules and regulations irrespective of the perceived importance of any of those rules. "In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." *Virginia* v. *Moore*, 553 U. S. ___, ___ (2008) (slip op., at 6). The Fourth Amendment rule for searches is the same: Police officers are entitled to search regardless of the perceived triviality of the underlying law. As we have explained, requiring police to make "sensitive, case-by-case determinations of government need," *Atwater* v. *Lago Vista*, 532 U. S. 318, 347 (2001), for a particular prohibi-

tion before conducting a search would "place police in an almost impossible spot," *id.*, at 350.

The majority has placed school officials in this "impossible spot" by questioning whether possession of Ibuprofen and Naproxen causes a severe enough threat to warrant investigation. Had the suspected infraction involved a street drug, the majority implies that it would have approved the scope of the search. See *ante*, at 9 (relying on the "limited threat of the specific drugs he was searching for"); *ante,* at 10 (relying on the limited "power of the drugs" involved). In effect, then, the majority has replaced a school rule that draws no distinction among drugs with a new one that does. As a result, a full search of a student's person for prohibited drugs will be permitted only if the Court agrees that the drug in question was sufficiently dangerous. Such a test is unworkable and unsound. School officials cannot be expected to halt searches based on the possibility that a court might later find that the particular infraction at issue is not severe enough to warrant an intrusive investigation.[4]

————————

[4]JUSTICE GINSBURG suggests that requiring Redding to "sit on a chair outside [the assistant principal's] office for over two hours" and failing to call her parents before conducting the search constitutes an "[a]buse of authority" that "should not be shielded by official immunity." See *ante*, at 1–2. But the school was under no constitutional obligation to call Redding's parents before conducting the search: "[R]easonableness under the Fourth Amendment does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty.* v. *Earls*, 536 U. S. 822, 837 (2002) (internal quotation marks and brackets omitted). For the same reason, the Constitution did not require school officials to ask "followup questions" after they had already developed reasonable suspicion that Redding possessed drugs. See *ante*, at 6, 10 (majority opinion); *ante*, at 1 (opinion of GINSBURG, J.). In any event, the suggestion that requiring Redding to sit in a chair for two hours amounted to a deprivation of her constitutional rights, or that school officials are required to engage in

A rule promulgated by a school board represents the judgment of school officials that the rule is needed to maintain "school order" and "a proper educational environment." *T. L. O.*, 469 U. S., at 343, n. 9. Teachers, administrators, and the local school board are called upon both to "protect the . . . safety of students and school personnel" and "maintain an environment conducive to learning." *Id.*, at 353 (Blackmun, J., concurring in judgment). They are tasked with "watch[ing] over a large number of students" who "are inclined to test the outer boundaries of acceptable conduct and to imitate the misbehavior of a peer if that misbehavior is not dealt with quickly." *Id.*, at 352. In such an environment, something as simple as a "water pistol or peashooter can wreak [havoc] until it is taken away." *Ibid.* The danger posed by unchecked distribution and consumption of prescription pills by students certainly needs no elaboration.

Judges are not qualified to second-guess the best manner for maintaining quiet and order in the school environment. Such institutional judgments, like those concerning the selection of the best methods for "restrain[ing students] from assaulting one another, abusing drugs and alcohol, and committing other crimes," *id.,* at 342, n. 9, "involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Collins* v. *Harker Heights*, 503 U. S. 115, 129 (1992); cf. *Regents of Univ. of Mich.* v. *Ewing*, 474 U. S. 214, 226 (1985) (observing that federal courts are not "suited to evaluat[ing] the substance of the multitude of academic decisions" or disciplinary decisions "that are

--------

detailed interrogations before conducting searches for drugs, only reinforces the conclusion that the Judiciary is ill-equipped to second-guess the daily decisions made by public administrators. Cf. *Beard* v. *Banks*, 548 U. S. 521, 536–537 (2006) (THOMAS, J., concurring in judgment).

made daily by faculty members of public educational institutions"). It is a mistake for judges to assume the responsibility for deciding which school rules are important enough to allow for invasive searches and which rules are not.

3

Even if this Court were authorized to second-guess the importance of school rules, the Court's assessment of the importance of this district's policy is flawed. It is a crime to possess or use prescription-strength Ibuprofen without a prescription. See Ariz. Rev. Stat. Ann. §13–3406(A)(1) (West Supp. 2008) ("A person shall not knowingly . . . [p]ossess or use a prescription-only drug unless the person obtains the prescription-only drug pursuant to a valid prescription of a prescriber who is licensed pursuant to [state law]").[5] By prohibiting unauthorized prescription drugs on school grounds—and conducting a search to ensure students abide by that prohibition—the school rule here was consistent with a routine provision of the state criminal code. It hardly seems unreasonable for school officials to enforce a rule that, in effect, proscribes conduct that amounts to a crime.

———————

[5] Arizona's law is not idiosyncratic; many States have separately criminalized the unauthorized possession of prescription drugs. See, *e.g.*, Mo. Rev. Stat. §577.628(1) (Supp. 2008) ("No person less than twenty-one years of age shall possess upon the real property comprising a public or private elementary or secondary school or school bus prescription medication without a valid prescription for such medication"); Okla. Stat., Tit. 59, §353.24(2) (Supp. 2008) ("It shall be unlawful for any person, firm or corporation to . . . [s]ell, offer for sale, barter or give away any unused quantity of drugs obtained by prescription, except . . . as provided by the State Board of Pharmacy"); Utah Code Ann. §58–17b–501(12) (Lexis 2007) ("'Unlawful conduct' includes: using a prescription drug . . . for himself that was not lawfully prescribed for him by a practitioner"); see also Ala. Code §34–23–7 (2002); Del. Code Ann., Tit. 16, §4754A(a)(4) (Supp. 2008); Fla. Stat. §499.005(14) (2007); N. H. Rev. Stat. Ann. §318:42(I) (Supp. 2008).

Moreover, school districts have valid reasons for punishing the unauthorized possession of prescription drugs on school property as severely as the possession of street drugs; "[t]eenage abuse of over-the-counter and prescription drugs poses an increasingly alarming national crisis." Get Teens Off Drugs, The Education Digest 75 (Dec. 2006). As one study noted, "more young people ages 12–17 abuse prescription drugs than any illicit drug except marijuana—more than cocaine, heroin, and methamphetamine combined." Executive Office of the President, Office of National Drug Control Policy (ONDCP), Prescription for Danger 1 (Jan. 2008) (hereinafter Prescription for Danger). And according to a 2005 survey of teens, "nearly one in five (19 percent or 4.5 million) admit abusing prescription drugs in their lifetime." Columbia University, The National Center on Addiction and Substance Abuse (CASA), "You've Got Drugs!" V: Prescription Drug Pushers on the Internet 2 (July 2008); see also Dept. of Health and Human Services, National Institute on Drug Abuse, High School and Youth Trends 2 (Dec. 2008) ("In 2008, 15.4 percent of 12th-graders reported using a prescription drug nonmedically within the past year").

School administrators can reasonably conclude that this high rate of drug abuse is being fueled, at least in part, by the increasing presence of prescription drugs on school campuses. See, *e.g.,* Gibson, Grand Forks Schools See Rise In Prescription Drug Abuse, Grand Forks Herald, Nov. 16, 2008, p. 1 (explaining that "prescription drug abuse is growing into a larger problem" as students "bring them to school and sell them or just give them to their friends"). In a 2008 survey, "44 percent of teens sa[id] drugs are used, kept or sold on the grounds of their schools." CASA, National Survey of American Attitudes on Substance Abuse XIII: Teens and Parents 19 (Aug. 2008) (hereinafter National Survey). The risks posed by the abuse of these drugs are every bit as serious as the dangers of using a

typical street drug.

Teenagers are nevertheless apt to "believe the myth that these drugs provide a medically safe high." ONDCP, Teens and Prescription Drugs: An Analysis of Recent Trends on the Emerging Drug Threat 3 (Feb. 2007) (hereinafter Teens and Prescription Drugs). But since 1999, there has "been a dramatic increase in the number of poisonings and even deaths associated with the abuse of prescription drugs." Prescription for Danger 4; see also Dept. of Health and Human Services, The NSDUH Report: Trends in Nonmedical Use of Prescription Pain Relievers: 2002 to 2007, p. 1 (Feb. 5, 2009) ("[A]pproximately 324,000 emergency department visits in 2006 involved the non-medical use of pain relievers"); CASA, Under the Counter: The Diversion and Abuse of Controlled Prescription Drugs in the U. S., p. 25 (July 2005) ("In 2002, abuse of controlled prescription drugs was implicated in at least 23 percent of drug-related emergency department admissions and 20.4 percent of all single drug-related emergency department deaths"). At least some of these injuries and deaths are likely due to the fact that "[m]ost controlled prescription drug abusers are poly-substance abusers," *id.*, at 3, a habit that is especially likely to result in deadly drug combinations. Furthermore, even if a child is not immediately harmed by the abuse of prescription drugs, research suggests that prescription drugs have become "gateway drugs to other substances of abuse." *Id.*, at 4; Healy, Skipping the Street, Los Angeles Times, Sept. 15, 2008, p. F1 ("Boomers made marijuana their 'gateway' . . . but a younger generation finds prescription drugs an easier score"); see also National Survey 17 (noting that teens report "that prescription drugs are easier to buy than beer").

Admittedly, the Ibuprofen and Naproxen at issue in this case are not the prescription painkillers at the forefront of the prescription-drug-abuse problem. See Prescription for

Danger 3 ("Pain relievers like Vicodin and OxyContin are the prescription drugs most commonly abused by teens"). But they are not without their own dangers. As nonsteroidal anti-inflammatory drugs (NSAIDs), they pose a risk of death from overdose. The Pill Book 821, 827 (H. Silverman, ed., 13th ed. 2008) (observing that Ibuprofen and Naproxen are NSAIDs and "[p]eople have died from NSAID overdoses"). Moreover, the side-effects caused by the use of NSAIDs can be magnified if they are taken in combination with other drugs. See, *e.g.,* Reactions Weekly, p. 18 (Issue no. 1235, Jan. 17, 2009) ("A 17-year-old girl developed allergic interstitial nephritis and renal failure while receiving escitalopram and ibuprofen"); *id.*, at 26 (Issue no. 1232, Dec. 13, 2008) ("A 16-month-old boy developed iron deficiency anaemia and hypoalbuminaemia during treatment with naproxen"); *id.*, at 15 (Issue no. 1220, Sept. 20, 2008) (18-year-old "was diagnosed with pill-induced oesophageal perforation" after taking ibuprofen "and was admitted to the [intensive care unit]"); *id.*, at 20 (Issue no. 1170, Sept. 22, 2007) ("A 12-year-old boy developed anaphylaxis following ingestion of ibuprofen").

If a student with a previously unknown intolerance to Ibuprofen or Naproxen were to take either drug and become ill, the public outrage would likely be directed toward the school for failing to take steps to prevent the unmonitored use of the drug. In light of the risks involved, a school's decision to establish and enforce a school prohibition on the possession of any unauthorized drug is thus a reasonable judgment.[6]

_____

[6] Schools have a significant interest in protecting all students from prescription drug abuse; young female students are no exception. See Teens and Prescription Drugs 2 ("Prescription drugs are the most commonly abused drug among 12–13-year-olds"). In fact, among 12- to 17-year-olds, females are "more likely than boys to have abused prescription drugs" and have "higher rates of dependence or abuse involving prescription drugs." *Id.*, at 5. Thus, rather than undermining the

\* \* \*

In determining whether the search's scope was reasonable under the Fourth Amendment, it is therefore irrelevant whether officials suspected Redding of possessing prescription-strength Ibuprofen, nonprescription-strength Naproxen, or some harder street drug. Safford prohibited its possession on school property. Reasonable suspicion that Redding was in possession of drugs in violation of these policies, therefore, justified a search extending to any area where small pills could be concealed. The search did not violate the Fourth Amendment.

## II

By declaring the search unreasonable in this case, the majority has "'surrender[ed] control of the American public school system to public school students'" by invalidating school policies that treat all drugs equally and by second-guessing swift disciplinary decisions made by school officials. See *Morse*, 551 U. S., at 421 (THOMAS, J., concurring) (quoting *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 526 (1969) (Black, J., dissenting)). The Court's interference in these matters of great concern to teachers, parents, and students illustrates why the most constitutionally sound approach to the question of applying the Fourth Amendment in local public schools would in fact be the complete restoration of the common-law doctrine of *in loco parentis*.

"[I]n the early years of public schooling," courts applied the doctrine of *in loco parentis* to transfer to teachers the authority of a parent to "'command obedience, to control stubbornness, to quicken diligence, and to reform bad habits.'" *Morse*, *supra,* at 413–414 (THOMAS, J., concur-

_____

relevant governmental interest here, Redding's age and sex, if anything, increased the need for a search to prevent the reasonably suspected use of prescription drugs.

ring) (quoting *State* v. *Pendergrass*, 19 N. C. 365, 365–366 (1837)).  So empowered, schoolteachers and administrators had almost complete discretion to establish and enforce the rules they believed were necessary to maintain control over their classrooms.  See 2 J. Kent, Commentaries on American Law 205 (1873) ("So the power allowed by law to the parent over the person of the child may be delegated to a tutor or instructor, the better to accomplish the purpose of education"); 1 W. Blackstone, Commentaries on the Laws of England 441 (1765) ("He may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed").[7]  The perils of judicial policymaking inherent in applying Fourth Amendment protections to public schools counsel in favor of a return to the understanding that existed in this Nation's first public schools, which gave teachers discretion to craft the rules needed to carry out the disciplinary responsibilities delegated to them by parents.

If the common-law view that parents delegate to teachers their authority to discipline and maintain order were to be applied in this case, the search of Redding would stand.  There can be no doubt that a parent would have had the authority to conduct the search at issue in this case.  Parents have "immunity from the strictures of the Fourth Amendment" when it comes to searches of a child

---

[7] The one aspect of school discipline with respect to which the judiciary at times became involved was the "imposition of excessive physical punishment." *Morse*, 551 U. S., at 416 (THOMAS, J., concurring).  Some early courts found corporal punishment proper "as long as the teacher did not act with legal malice or cause permanent injury;" while other courts intervened only if the punishment was "clearly excessive." *Ibid.* (emphasis deleted and internal quotation marks omitted) (collecting decisions).

or that child's belongings. *T. L. O.*, 469 U. S., at 337; see also *id.*, at 336 (A parent's authority is "not subject to the limits of the Fourth Amendment"); *Griffin* v. *Wisconsin*, 483 U. S. 868, 876 (1987) ("[P]arental custodial authority" does not require "judicial approval for [a] search of a minor child's room").

As acknowledged by this Court, this principle is based on the "societal understanding of superior and inferior" with respect to the "parent and child" relationship. *Georgia* v. *Randolph*, 547 U. S. 103, 114 (2006). In light of this relationship, the Court has indicated that a parent can authorize a third-party search of a child by consenting to such a search, even if the child denies his consent. See *ibid.;* see also 4 W. LaFave, Search and Seizure §8.3(d), p. 160 (4th ed. 2004) ("[A] father, as the head of the household with the responsibility and the authority for the discipline, training and control of his children, has a superior interest in the family residence to that of his minor son, so that the father's consent to search would be effective notwithstanding the son's contemporaneous on-the-scene objection" (internal quotation marks omitted)). Certainly, a search by the parent himself is no different, regardless of whether or not a child would prefer to be left alone. See *id.,* §8.4(b), at 202 ("[E]ven [if] a minor child . . . may think of a room as 'his,' the overall dominance will be in his parents" (internal quotation marks omitted)).

Restoring the common-law doctrine of *in loco parentis* would not, however, leave public schools entirely free to impose any rule they choose. "If parents do not like the rules imposed by those schools, they can seek redress in school boards or legislatures; they can send their children to private schools or home school them; or they can simply move." See *Morse*, 551 U. S., at 419 (THOMAS, J., concurring). Indeed, parents and local government officials have proved themselves quite capable of challenging overly harsh school rules or the enforcement of sensible rules in

insensible ways.

For example, one community questioned a school policy that resulted in "an 11-year-old [being] arrested, hand-cuffed, and taken to jail for bringing a plastic butter knife to school." Downey, Zero Tolerance Doesn't Always Add Up, The Atlanta Journal-Constitution, Apr. 6, 2009, p. A11. In another, "[a]t least one school board member was outraged" when 14 elementary-school students were suspended for "imitating drug activity" after they combined Kool-Aid and sugar in plastic bags. Grant, Pupils Trading Sweet Mix Get Sour Shot of Discipline, Pittsburgh Post-Gazette, May 18, 2006, p. B1. Individuals within yet another school district protested a "'zero-tolerance' policy toward weapons" that had become "so rigid that it force[d] schools to expel any student who belongs to a military organization, a drum-and-bugle corps or any other legitimate extracurricular group and is simply transporting what amounts to harmless props." Richardson, School Gun Case Sparks Cries For "Common Sense," Washington Times, Feb. 13, 2009, p. A1.[8]

These local efforts to change controversial school policies through democratic processes have proven successful in

---

[8] See also, *e.g.*, Smydo, Allderdice Parents Decry Suspensions, Pittsburgh Post-Gazette, Apr. 16, 2009, p. B1 (Parents "believe a one-day suspension for a first-time hallway infraction is an overreaction"); O'Brien & Buckham, Girl's Smooch on School Bus Leads to Suspension, Buffalo News, Jan. 6, 2008, p. B1 (Parents of 6-year-old say the "school officials overreacted" when they punished their daughter for "kissing a second-grade boy"); Stewart, Camera Phone Controversy: Dad Says School Overreacted, Houston Chronicle, Dec. 12, 2007, p. B5 ("The father of a 13-year-old . . . said the school district overstepped its bounds when it suspended his daughter for taking a cell phone photo of another cheerleader getting out of the shower during a sleepover in his home"); Dumenigo & Mueller, "Cops and Robbers" Suspension Criticized at Sayreville School, The [New Jersey] Star-Ledger, Apr. 6, 2000, p. 15 (" 'I think it's ridiculous,' said the mother of one of the [kindergarten] boys. 'They're little boys playing with each other. . . . when did a finger become a weapon?'").

many cases. See, *e.g.,* Postal, Schools' Zero Tolerance Could Lose Some Punch, Orlando Sentinel, Apr. 24, 2009, p. B3 ("State lawmakers want schools to dial back strict zero-tolerance policies so students do not end up in juvenile detention for some 'goofy thing' "); Richardson, Tolerance Waning for Zero-tolerance Rules, Washington Times, Apr. 21, 2009, p. A3 ("[A] few states have moved to relax their laws. Utah now allows students to bring asthma inhalers to school without violating the zero-tolerance policy on drugs"); see also Nussbaum, Becoming Fed Up With Zero Tolerance, New York Times, Sept. 3, 2000, Section 14, p. 1 (discussing a report that found that "widespread use of zero-tolerance discipline policies was creating as many problems as it was solving and that there were many cases around the country in which students were harshly disciplined for infractions where there was no harm intended or done").

In the end, the task of implementing and amending public school policies is beyond this Court's function. Parents, teachers, school administrators, local politicians, and state officials are all better suited than judges to determine the appropriate limits on searches conducted by school officials. Preservation of order, discipline, and safety in public schools is simply not the domain of the Constitution. And, common sense is not a judicial monopoly or a Constitutional imperative.

## III

"[T]he nationwide drug epidemic makes the war against drugs a pressing concern in every school." *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty.* v. *Earls*, 536 U. S. 822, 834 (2002). And yet the Court has limited the authority of school officials to conduct searches for the drugs that the officials believe pose a serious safety risk to their students. By doing so, the majority has confirmed that a return to the doctrine of *in loco parentis* is

required to keep the judiciary from essentially seizing control of public schools. Only then will teachers again be able to "'govern the[ir] pupils, quicken the slothful, spur the indolent, restrain the impetuous, and control the stubborn'" by making "'rules, giv[ing] commands, and punish[ing] disobedience'" without interference from judges. See *Morse*, *supra*, at 414. By deciding that it is better equipped to decide what behavior should be permitted in schools, the Court has undercut student safety and undermined the authority of school administrators and local officials. Even more troubling, it has done so in a case in which the underlying response by school administrators was reasonable and justified. I cannot join this regrettable decision. I, therefore, respectfully dissent from the Court's determination that this search violated the Fourth Amendment.